**Reversed and Rendered and Opinion filed October 15, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-14-00201-CV

---

## HOUSTON METHODIST SAN JACINTO HOSPITAL, Appellant

## V.

## TERI FORD, Appellee

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2010-63292**

---

### O P I N I O N

Appellee Teri Ford sued appellant Houston Methodist San Jacinto Hospital (the Hospital) after the Hospital fired her. A jury found in Ford's favor on her claim for retaliation under the Texas Commission on Human Rights Act (TCHRA). The jury found that Ford was fired because she reported sexual harassment, which as the jury instructions explained, required Ford to have a "reasonable belief" that sexual harassment occurred. The Hospital challenges the legal sufficiency of the evidence to support that finding, alleging there is no evidence that Ford's belief was reasonable because her belief was based on two attempted kisses by her supervisor Raul Reyes

three and a half years earlier, which did not alter a term, condition, or privilege of employment.

We agree, and we reverse the trial court's judgment and render judgment that Ford take nothing.[1]

## I. LEGAL SUFFICIENCY OF THE EVIDENCE

First, we review the standards for reviewing the legal sufficiency of the evidence. Then, we review the legal principles for a retaliation claim under the TCHRA. Finally, we review the jury charge, relevant evidence, and applicable legal authorities. We hold that there is no evidence to support the jury's answer to Question No. 1, wherein the jury found that Ford reported sexual harassment.

## A. Standard of Review

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the jury's finding, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). We do not disregard undisputed evidence that allows for only one logical inference. *Id.* at 814. The jury is the only judge of the witnesses' credibility and the weight given to their testimony. *See id.* at 819.

Because the Hospital attacks the legal sufficiency of a finding on which it did not have the burden of proof, the Hospital must demonstrate that there is no evidence to support the finding. *See id.* at 810. We may not sustain a legal sufficiency, or "no evidence," point unless the record demonstrates that: (1) there is a complete absence

---

[1] The Hospital's first two issues on appeal complain of the trial court's failure to grant the Hospital's motion for JNOV and the legal sufficiency of the evidence on the same basis; the Hospital argues the issues together without distinction. We address the Hospital's issues under the same "no evidence" standard. *See Tanner v. Nationwide Mut. Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

2

of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.  *Id.*

## B.    TCHRA Legal Principles

As part of Ford's claim, she had to prove that she engaged in an activity protected by the TCHRA, which includes opposing a discriminatory practice such as sexual harassment.  *See San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015); *see also* Tex. Lab. Code Ann. § 21.055.  Making an internal grievance about alleged sexual harassment "reasonably equates to opposition to discriminatory conduct 'under' the [T]CHRA."  *City of Waco v. Lopez*, 259 S.W.3d 147, 151 (Tex. 2008); *see also Nicholas*, 461 S.W.3d at 135, 137.

Opposing sexual harassment is a protected activity irrespective of the merits of the underlying claim of sexual harassment.  *Nicholas*, 461 S.W.3d at 137; *see also Lee v. Harris Cnty. Hosp. Dist.*, No. 01-12-00311-CV, 2013 WL 5637049, at *5 (Tex. App.—Houston [1st Dist.] Oct. 15, 2013, pet. denied) (mem. op.) (noting that the "employee is not required to prove an actual unlawful practice"); *Cox & Smith Inc. v. Cook*, 974 S.W.2d 217, 224 (Tex. App.—San Antonio 1998, pet. denied) ("The employee is not required to show that there was actual existence of an unlawful practice . . . .").  The purpose of the anti-retaliation provision is to prevent an employer "from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," such as securing a workplace where individuals are not discriminated against because of gender-based status.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006); *accord Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 330 (Tex. App.—Texarkana 2008, pet.

denied).[2]  Requiring the employee to prove actual sexual harassment would "chill[] the legitimate assertion of employee rights."  *See Lewis v. Lowe's Home Ctrs., Inc.*, No. 13-12-00629-CV, 2014 WL 2937010, at \*3 (Tex. App.—Corpus Christi June 26, 2014, no pet.) (mem. op.).

But, as relevant to the Hospital's legal sufficiency challenge, the employee has the burden to "demonstrate a good-faith, ***reasonable*** belief that the underlying discriminatory practice violated the TCHRA."  *Nicholas*, 461 S.W.3d at 137 (emphasis added).  A subjective belief of sexual harassment, alone, is insufficient. *See Lewis*, 2014 WL 2937010, at \*3; *see also Nicholas*, 461 S.W.3d at 138 (court of appeals erred by focusing "only on the *subjective* belief of the actors involved").  The employee must prove "an objectively reasonable belief that a violation is actually occurring based on circumstances that the employee observes and reasonably believes."  *Nicholas*, 461 S.W.3d at 138 (quotation omitted).  An employee's retaliation claim fails if "no reasonable person would believe that [the reported conduct] amounted to sexual harassment actionable under the TCHRA."  *Id.*

Because the employee must reasonably believe that the reported conduct was "actionable under the TCHRA," it is not enough that the employee found the reported conduct offensive or unwelcome.  *See id.*  The Hospital and Ford both agree that the determination of whether Ford's belief was objectively reasonable should be measured against existing substantive law describing the parameters of unlawful sexual harassment under the TCHRA and Title VII.  *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *Patterson v. State*, 256 P.3d 718, 729 (Idaho 2011) (concluding the only favorable case that Patterson cited was decided a month and a half after her letter of resignation and could not have been relied upon in

---

[2] Cases interpreting Title VII of the Civil Rights Act of 1964 are persuasive for applying similar provisions in the TCHRA, such as the prohibition on retaliating against an employee for opposing a discriminatory practice.  *See, e.g.*, *Nicholas*, 461 S.W.3d at 136–37.

4

making her determination as to the reasonableness of her belief that she was engaging in protected activity); *see also, e.g.*, *Nicholas*, 461 S.W.3d at 138 (reviewing substantive law for sexual harassment under the TCHRA to determine if the plaintiff's belief was reasonable). Further, in reviewing the scope of conduct that may be considered, "what counts is only the conduct that the person opposed." *Nicholas*, 461 S.W.3d at 137 (quotation omitted).[3]

Under the TCHRA, a sexual-harassment claim requires the employee to prove more than that the employee found the complained-of conduct offensive. *See id.* (citing *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 805 (Tex. 2010)). Rather, the harassment must affect the "terms, conditions, or privileges of employment." Tex. Lab. Code § 21.051(1), *quoted in Nicholas*, 461 S.W.3d at 138. "Accordingly, sexual harassment is actionable 'only if it is so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Nicholas*, 461 S.W.3d at 138 (alteration in original) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)).

"Offhand comments and isolated incidents, unless extremely serious, typically will not amount to discriminatory changes in the terms, conditions, or privileges of employment." *Id.* (quotations omitted). Isolated yet offensive sexual conduct—such as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature—does not itself constitute discrimination that alters a term, condition, or privilege of employment. *See Twigland Fashions, Ltd. v. Miller*, 335 S.W.3d 206, 217 (Tex. App.—Austin 2010, no pet.). The conduct must

---

[3] Although an employee need not use "magic words" to oppose sexual harassment, the report must "contain sufficient description to at least alert an employer of what discriminatory practice the employee reasonably believes occurred; '[a] vague charge of discrimination will not invoke the protection under the statute.'" *Lewis*, 2014 WL 2937010, at \*4 (quoting *Spinks v. Trugreen Landcare, L.L.C.*, 322 F. Supp. 2d 784, 797 (S.D. Tex. 2004)). The employee must indicate what alleged discriminatory conduct is at issue. *Id.*

go beyond merely being offensive so as to create an abusive working environment. *See id.* at 219; *see also Nicholas*, 461 S.W.3d at 138.

A plaintiff asserting a retaliation claim must demonstrate that a "reasonable person could believe [the reported conduct] constituted sexual harassment actionable under the law." *Nicholas*, 461 S.W.3d at 138. That is, the employee must reasonably believe that the reported conduct was "so severe or pervasive as to alter the conditions of employment or create an abusive work environment." *Id.*

## C. No Evidence that Ford Reported Sexual Harassment

The Hospital contends there is no evidence to support the jury's answer to Question No. 1, wherein the jury found that Ford reported sexual harassment. In particular, the Hospital argues there is no evidence that Ford's belief that she was reporting sexual harassment was objectively reasonable because there is no evidence that two attempted kisses occurring three and a half years earlier altered a term, condition, or privilege of Ford's employment. We now review the jury charge, evidence, and legal authorities.

### 1. Jury Charge

Jury Question No. 1 appears as follows:

Did Teri Ford report sexual harassment on March 25, 2009?

You are instructed that "sexual harassment" is defined as:

1. Teri Ford, Donna Miller, or Louree Heintschel[4] being subjected to unwelcome and undesirable conduct, including unwelcome sexual advance(s) or demand(s), by Raul Reyes that was offensive to Teri Ford, Donna Miller, or Louree Heintschel; and

---

[4] This name is spelled differently in the reporter's record. We use the spelling appearing in the jury charge.

6

2. The harassment complained of altered a term, condition or privilege of employment.

Harassment alters a term, condition, or privilege of employment when a reasonable person would find that the harassment created an abusive working environment. In determining whether an abusive working environment existed, consider the following: the frequency of the conduct; its severity; whether it was physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

You are instructed for purposes of this question that, in order to make a report of sexual harassment, Teri Ford does not have to prove the actual existence of sexual harassment, but only that she had a good faith reasonable belief that sexual harassment occurred.

Answer "Yes" or "No" for each of the following:

Teri Ford: _____

Donna Miller: _____

Louree Heinstchel: _____

The jury answered "yes" to Ford and "no" to the other employees.

We note that the instruction accurately informed the jury that sexual harassment required the alteration of a term, condition, or privilege of employment, which occurs when a reasonable person would find the harassment created an abusive working environment. The instruction also accurately informed the jury that Ford's belief that sexual harassment occurred had to be objectively reasonable. And, the instruction limited the inquiry to what Ford reported on March 25, 2009.

### 2. *The Evidence*

#### a. *Ford's history with the Hospital and Reyes*

Ford began working for the Hospital in 1998 as an MRI technician in the imaging department. Reyes was hired as the director of the imaging department in 2005. In May 2005, during the first time Ford met with Reyes, he appointed her as a

7

team leader of the MRI component of the imaging department. Reyes selected Ford for a supervisory position in October 2005.[5] Reyes again promoted Ford to a manager position in January 2008.

In 2008, the Hospital received anonymous complaints that Reyes was having an affair with Ford, holding her hand, frequently going to lunch with her, leaving work with her, and having long, closed-door meetings with her. Sherri Sampson, the director of the human resources department, investigated the complaints. Dan Newman (Reyes's supervisor) and Sampson spoke with Ford and discussed issues of favoritism and whether Reyes and Ford were having an affair. Ford denied having an affair with Reyes and did not report any inappropriate conduct by Reyes. Ford testified that she discussed these issues with Newman and Sampson, but that she did not bring up any of the issues or share any concerns with them about her meetings with Reyes. Sampson determined the complaints were unfounded, although Ford and Reyes were each placed on "action plans" to help prevent the appearance of favoritism or a romantic relationship. Ford was concerned that she was being asked to create an action plan when she did not have any control over the length of meetings with Reyes.

Nevertheless, Ford created a plan, as did Reyes. The Hospital staggered their working hours and implemented other guidelines to eliminate the unfavorable appearance. Ford testified that she felt "very, very uncomfortable" with the action plan, and she felt that it was "hindering how effectively [she] was managing [her] own job." Six to eight weeks later, the Hospital dispelled the action plan because there were "no further issues."

---

[5] Reyes also selected six other employees to supervise various components of the imaging department at that time.

8

On March 9, 2009, the Hospital fired Reyes for job-performance issues. Reyes continued to communicate with Ford and other employees and, in addition to communication that Ford considered "bizarre," Reyes requested information that Ford and others considered proprietary to the Hospital. When Reyes told Ford that he intended to request the Hospital return the SIM card from his Blackberry because it belonged to him, Ford and another employee reported their concerns to Newman that the SIM card might contain proprietary information. Ford then left town for vacation. Meanwhile, Newman reviewed the contents of Reyes's Blackberry and found over 150 pictures of Ford and her family and a "love letter" in a folder labeled "TF."

### b. The March 25, 2009 report of two attempted kisses

Ford returned to work from vacation on March 25, 2009, and she reported to Newman's office for a regularly scheduled meeting late in the day. She was surprised to find that Sampson would also be in the meeting and she "didn't feel it was good." Newman and Sampson then spent one and one-half hours with Ford discussing the contents of Reyes's Blackberry. Ford had no idea and never dreamed there would have been photos of her family on Reyes's Blackberry. Ford testified that Sampson began to read the letter aloud, and about halfway through, Ford broke down and cried.[6] Ford testified that she denied ever having received this letter from Reyes.[7] Ford testified that Sampson asked Ford if Reyes had ever acted inappropriately with Ford in the past. Ford testified further:

> I simply explained to them [Sampson and Newman] that I was going through a very dark time in my life. I lost my dad in 2005 in a

---

[6] About halfway through the letter, as discussed at trial, is the statement: "I know in all likelihood, we will never be more then [sic] co-workers, not even friends, because for whatever reason, you will not let it happen… you choose not discuss [sic] the pass, but no one can change history, what has happened, has happened." (ellipsis in original).

[7] This fact is hotly disputed; however, as stated above, we view the evidence in the light most favorable to the jury's verdict.

tragic motorcycle accident. It was very, very unexpected. I had a very hard time dealing with it. I'm sorry.

And around the time — I believe it was around September or October 2005 that Mr. Reyes had acted inappropriately with me, that there was two different occasions of unwanted sexual advances and that I explained to them on two different occasions Mr. Reyes tried to kiss me.[8]

Ford testified that the attempted kisses occurred a couple of weeks apart while she and Reyes sat at a small table in Reyes's office. Both times Reyes attempted to kiss Ford, she told Reyes it was inappropriate and that she was not interested in him and it should not happen again.

Ford testified that she felt like she handled the situation, and it never happened again. Ford testified that she did not have a problem working with Reyes over the next four years: "We were able to get past what had happened and had a very professional relationship thereafter." On cross-examination, Ford explained that she had not reported the attempted kisses to Sampson during the 2008 investigation because "[a]fter three years of a working professional relationship with no further incidents, no, I didn't see it necessary to tell her."

### c. The April 30, 2009 meeting and allegation of sexual harassment

Ford was called to a meeting with Newman and Sampson on April 30. Prior to the meeting, Ford had "no doubt" she was about to be fired. Newman told Ford she was being fired. Then, Ford said she thought her termination was wrongful and she was being terminated for reporting sexual harassment by Reyes. Ford told Sampson that she felt pressured to have lunches with Reyes offsite and have extended meetings

---

[8] Ford also testified that she told Sampson and Newman that two other unnamed employees had told Ford in 2005 that Reyes acted inappropriately with them. Ford testified that Miller had told Ford that Reyes had attempted to kiss Miller. Ford testified that Heinstchel told Ford that Reyes had told Heinstchel that Reyes loved Heinstchel. As mentioned above, however, the jury found that Ford did not report sexual harassment of these two individuals, and Ford does not challenge that finding.

10

with Reyes. Sampson wrote in her notes from the meeting, "If she felt pressured through March 2009, then harassment was continuing."

At trial, Ford also adduced evidence of the Hospital's sexual harassment policy, which defined "sexual harassment," in part, as "an unwelcome sexual advance, request for sexual favors, or verbal or physical conduct of a sexual nature." Reyes's former secretary also testified that towards the end of Reyes's employment, the secretary and Ford had some sort of "code" to help "pull [Ford] out" of Reyes's office during meetings.

### 3. Analysis

We hold that there is no evidence to support a reasonable belief that two attempted kisses,[9] occurring three and a half years earlier without further incident, was sexual harassment actionable under the law. There is no evidence from which an employee could reasonably believe that two attempted kisses in 2005 were so severe or pervasive as to alter the conditions of employment or create an abusive work environment.[10]

In particular, Ford testified that she had a professional working relationship with Reyes for nearly four years after the two isolated sexual advances, and she was promoted twice after she rebuffed Reyes's advances. There were no further incidents, and there was a significant delay between the attempted kisses and Ford's later report. *Cf. Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 958,

---

[9] The reported conduct is the two attempted kisses. Before this court, Ford urges that Reyes's dominating her time and compelling lengthy meetings was also part of the offending conduct and the March 25 report. Neither of these positions is supported by the record. Ford testified that the only conduct she reported in the March 25 meeting was the attempted kisses. As outlined above, Ford resisted an action plan directed at the lengthy meetings with Reyes and stated that the action plan interfered with her ability to perform her job effectively.

[10] Although the Hospital also challenges the sufficiency of the evidence to support Ford's subjective, good faith belief, we do not reach that issue in light of our holding on the objective component of Ford's claim. *See* Tex. R. App. P. 47.1.

960 (11th Cir. 1997) (holding as a matter of law that the employee did not have an objectively reasonable belief that he opposed unlawful discrimination when the employee waited eight months to report a racist comment by a coworker). Various courts have held that more egregious conduct was not actionable sexual harassment. *See Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (no actionable sexual harassment when a male employee harassed a female employee in the following ways: "(1) he once made a remark to [the plaintiff] about another employee's body, (2) he once slapped her on the behind with a newspaper, (3) he 'grabbed or brushed' against [the plaintiff's] breasts and behind, (4) he once held her cheeks and ***tried to kiss her***, (5) he asked [the plaintiff] to come to the office early so that they could be alone, and (6) he once stood in the door of the bathroom while she was washing her hands" (emphasis added)); *Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993) (no actionable sexual harassment when a male supervisor asked the female employee for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, attempted to kiss her once at a bar, and ***attempted to kiss her twice*** at the office); *Spring v. Walthall, Sachse & Pipes, Inc.*, No. 04-09-00474-CV, 2010 WL 2102988, at \*5, \*7 (Tex. App.—San Antonio May 26, 2010, no pet.) (mem. op.) (no actionable sexual harassment when the supervisor allegedly once pushed the employee's head into his hip and patted her head, once thrust his buttocks into her pelvic area in a crowded elevator and grinded from side to side while laughing, and once ***kissed her*** cheek and neck).

Undoubtedly, there is evidence that Ford reasonably could have believed the attempted kisses were unwelcome sexual advances, but there is no evidence that Ford reasonably believed the "working conditions" component of an actionable sexual harassment claim existed when she made the report in March 2009. The only alterations in the conditions of employment that Ford arguably points to are that

Reyes required too many meetings and kept her away from others in the department. However, crediting this testimony as we must, it nonetheless cannot be tied to an objectively reasonable report of changed working conditions in March 2009 when Ford made the report. Ford testified that there were no further incidents for nearly four years, and Reyes was no longer employed by the Hospital at the time of the report.

Further, to the extent Ford argues that her belief was reasonable because Ford's report "meets the definition of sexual harassment according to Appellant's own policy," we note that several Texas appellate court have rejected the notion that an employer's sexual harassment policy can make reasonable an employee's otherwise unreasonable belief. *See Lewis*, 2014 WL 2937010, at *5 (employee's belief was not objectively reasonable even though the employer's sexual harassment policy broadly defined sexual harassment as unwelcome touching; declining the employee's "invitation to allow a company's policies to expand the coverage of the TCHRA beyond the scope expressly delineated by the Legislature"); *see also Lucan v. HSS Sys., L.L.C.*, 439 S.W.3d 606, 613 (Tex. App.—Eastland 2014, no pet.) ("[E]ven if the conduct of Lucan's coworkers fell within the definition of sexual harassment under the [employer's] policy, that conduct would not have given Lucan any reason to believe that [the employer] was engaging in unlawful discrimination against her or any other employee.").

Ford also cites several cases from outside Texas to support her argument that her belief was reasonable. The cases are distinguished on their facts and not binding, regardless. In *Westendorf v. West Coast Contractors of Nevada, Inc.*, the plaintiff was subjected to offensive sexual comments repeatedly over the course of about six months. *See* 712 F.3d 417, 419–20 (9th Cir. 2013) (describing comments such as asking the plaintiff if women "got off" using tampons, discussing women's orgasms

13

and breast sizes, asking whether the plaintiff was intimidated by other women's breasts, and telling the plaintiff that she had to clean his work area while wearing a French maid's costume). The plaintiff promptly reported each incident to the company's president and voiced her opposition. *See id.* at 420–21. Although there was no evidence to support an actionable sexual harassment claim, *see id.* at 422, there was some evidence that the plaintiff reasonably believed she was subjected to sexual harassment due to the repeated offensive sexual comments and the plaintiff's prompt reporting, *see id.* at 423. Similarly, in *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146 (C.D. Cal. 2013), the plaintiff reported a "pervasive pattern of conduct" by other employees, including numerous sexual comments, salacious remarks, "picking up" women at company events, and conversations about "women exploits." *Id.* at 1180. On multiple occasions, several different employees observed the inappropriate conduct and comments. *Id.*

Here, there is no evidence that Ford reported a repeated or pervasive level of harassment that even arguably altered the terms, conditions, or privileges of her employment or created an abusive working environment. By her own testimony, the two attempted kisses occurred nearly four years before the March 2009 meeting without further incident, and Ford enjoyed a professional relationship with Reyes until his termination for non-harassment reasons.

Ford also points to *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403 (S.D.N.Y. 1996), where the district court ruled that an employee in the graphics department could have had a reasonable belief that her employer's request that a photograph be transformed into a viewgraph constituted sexual harassment. *Id.* at 411. The plaintiff considered the photograph "sexually suggestive" because the photograph, from *Playboy* magazine, depicted "the face and bare shoulder of a woman who appears to be removing a jacket." *Id.* at 408. The district court noted

that the photograph was a "head and shoulders shot of an attractive woman with a mildly provocative expression" and would "stir an extreme reaction only in a woman of Victorian Delicacy—a woman mysteriously aloof from contemporary American popular culture in all its sex-saturated vulgarity." *Id.* at 411 (quotation omitted). Nonetheless, the district court upheld the jury's finding of retaliation because the photograph came from an erotic magazine, was intended to be sexually suggestive, and had a nude woman depicted on the reverse side; and, other women in the plaintiff's department were similarly offended. *Id.*

*Iannone* was decided before, and seems at odds with, *Clark County School District v. Breeden*, 532 U.S. 268 (2001). *Breeden* clarified that the reasonable-belief component of a retaliation claim is not satisfied by an "isolated incident" that is not "extremely serious." *Id.* at 271 (no reasonable belief of sexual harassment when male employees looked at a female employee and chuckled in her presence about a job applicant's sexual comment to another person).

*Iannone* is not persuasive in light of *Breeden* and the Texas Supreme Court's recent decision in *San Antonio Water System v. Nicholas*. In *Nicholas*, the supreme court held that no evidence supported the jury's finding that Nicholas reasonably believed she reported sexual harassment. 461 S.W.3d at 135, 138. Nicholas was chief of staff to the CEO, and she learned from the CEO and the company's general counsel that several other women had been repeatedly invited to lunch by a new vice president. *See id.* at 134. One of the women said she felt harassed and would file a formal complaint if the lunch invitations persisted. *Id.* at 134. Nicholas and the CEO met with the vice president to reprimand him in an attempt to prevent sexual harassment. *Id.* at 134–35. The supreme court held that no reasonable person could have believed the repeated lunch invitations constituted sexual harassment because there was no evidence the conduct was "so severe or pervasive as to alter the

15

conditions of employment or create an abusive work environment." *Id.* at 138. Therefore, even though another employee was threatening to file a sexual harassment complaint, Nicholas did not engage in a protected activity when she reprimanded the vice president. *See id.* at 136, 139. Unlike in *Nicholas*, the *Iannone* court never acknowledged that the plaintiff had to reasonably believe that the reported conduct was sufficiency severe or pervasive to alter the conditions of employment or create an abusive work environment. *See* 941 F. Supp. at 410–11.

The San Antonio Court of Appeals also reversed a jury's verdict when the plaintiff claimed to have been retaliated against for reporting sexual harassment. *See Cox & Smith Inc. v. Cook*, 974 S.W.2d 217, 227 (Tex. App.—San Antonio 1998, pet. denied). The jury heard evidence that the offending employee made a sexual joke about Hillary Clinton,[11] suggested that the plaintiff and Clinton were two of a kind and could hang out together, told the plaintiff she should quit her job and work for the Clinton campaign, wrote in a newsletter that he disliked people with "bitchy" attitudes, and on one occasion told the plaintiff that he thought the plaintiff and her former supervisor were "hiding the salami" because the former supervisor always talked about the plaintiff's breasts. *Id.* at 221. The court of appeals reasoned that only the Clinton joke and "salami" comment were sexual in nature. *Id.* at 227. The court held that it would be implausible to find that the plaintiff's belief that the offending employee engaged in sexual harassment was objectively reasonable, so the evidence was legally insufficient to support the jury's finding. *Id.*

Finally, at oral argument before this court, Ford pointed to *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396 (5th Cir. 2013), as the most factually analogous case on the reasonable-belief component of a retaliation claim. In *Royal*, the Fifth

---

[11] The offending-employee asked, "Do you know why they have outlawed short skirts in Washington D.C.?" When prompted, the employee said, "[B]ecause Hillary Clinton's balls would hang out." 974 S.W.2d at 221.

Circuit held that there was some evidence of a reasonable belief of the "severe or pervasive" component of a sexual harassment claim. *See id.* at 403. *Royal* involved more than a dozen instances of objectionable conduct over the course of the plaintiff's four days of employment with the company. *See id.* at 399. Two male employees repeatedly hovered over the female plaintiff's desk in a small, confined space and sniffed her in her office and as she exited the restroom; one of the men said he "needed to get a release"; and one of them sat behind her on a file cabinet while wearing shorts, legs apart and visibly aroused, and engaged in a "stare-down" for up to five minutes. *Id.* The court stated that "the only thing interrupting this conduct seems to have been Royal's termination." *Id.* at 402. The men's conduct led to a reasonable belief of sexual harassment because the conduct was physically threatening, humiliating, and frequent. *See id.* at 402.

The conduct in *Royal* is not comparable to the conduct here: two attempted kisses occurring nearly four years before the report, a professional relationship after the attempted kisses with no further incidents, and Reyes's lack of employment with the Hospital at the time of the report.[12] Under these particular circumstances, we hold there is no evidence to support the jury's implied finding that a reasonable person would have believed, at the time Ford reported it on March 25, 2009, that Reyes's conduct was "so severe or pervasive as to alter the conditions of employment or create an abusive work environment." *See Nicholas*, 461 S.W.3d at 138.[13]

---

[12] Because we determine that *Royal* is not analogous, we need not decide whether, as the Hospital urges, Ford may not rely upon authority from after the date of the report to show the reasonableness of her belief, which is measured against existing substantive law.

[13] This holding comports not only with the substantive law defining sexual harassment, but also the purpose of the anti-retaliation provision of the TCHRA, given that Reyes was no longer employed by the Hospital at the time of Ford's report. That is, Ford's report in March 2009 would not have secured or advanced the enforcement of a workplace where individuals are not discriminated against because the offending-employee was no longer in the picture. *See Bartosh*, 259 S.W.3d at 330.

Accordingly, there is legally insufficient evidence to support the jury's answer to Question No. 1.

## II. CONCLUSION

Having concluded that the evidence is legally insufficient to support the jury's verdict, we reverse the trial court's judgment and render judgment that Ford take nothing.[14]


/s/     Sharon McCally
Justice


Panel consists of Justices Jamison, McCally, and Wise.

---

[14] Because the Hospital's legal sufficiency issues are dispositive, we do not reach its third issue concerning the exclusion of evidence. *See* Tex. R. App. P. 47.1.