**Affirmed in part and reversed in part and Opinion filed April 4, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-17-00306-CV

**APACHE CORPORATION, Appellant**

**V.**

**CATHRYN C. DAVIS, Appellee**

**On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Cause No. 2014-23898**

## O P I N I O N

Appellant Apache Corporation appeals a judgment in favor of its former paralegal, appellee Cathryn C. Davis, on her retaliation claim under Chapter 21 of the Texas Labor Code. *See* Tex. Lab. Code § 21.055. A jury found that Davis filed a complaint of age or gender discrimination with Apache and that Apache discharged Davis because she filed the complaint. The jury also found that Davis engaged in misconduct and that Apache would have legitimately discharged her

solely on that basis. The jury awarded Davis no back pay and no future compensatory damages, but it did award $150,000 in past compensatory damages for Davis's emotional pain and suffering and other noneconomic losses related to the retaliation claim. The parties tried Davis's claim for attorneys' fees to the bench, and the trial court awarded Davis $767,242 in attorneys' fees plus an additional $100,000 in conditional appellate fees.

Apache challenges the trial court's judgment in four issues, arguing there is legally insufficient evidence that Davis engaged in protected activity, but-for causation is lacking, the jury charge is erroneous based on *Casteel* error,[1] and the attorneys' fees awarded by the trial court are unreasonable and unsupported by sufficient evidence. After reviewing the record, we conclude legally sufficient evidence supports the jury's findings that Davis engaged in a protected activity and that Apache retaliated against her for making a complaint. Given our disposition of Apache's first two issues, we conclude there was no *Casteel* error. We further conclude regarding the attorneys' fees that there is sufficient evidence to support the award of fees with the exception of a portion of the fees awarded for Dennis Herlong's time. As to those fees, we suggest a remittitur as described below. We affirm in part and reverse in part the trial court's judgment.

## BACKGROUND

Davis began working in Apache's litigation department in March 2006. At the time of her hire, Davis was 52 years old and had many years of experience as a paralegal. Attorney Roxanne Armstrong supervised the department and hired Davis for the position of Senior Paralegal.[2] The department included two other

---

[1] *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000).

[2] Apache hired Armstrong in 1991 to start and manage its litigation department. She remained the head of the litigation department at Apache for approximately fifteen years.

female paralegals, Laurie Fielder and Courtney Eldridge, both of whom were younger than Davis but had been at Apache several years longer. In 2007, Apache replaced Armstrong with attorney Dominic Ricotta as head of the litigation department. By all accounts, Davis performed her work well, as reflected in her performance reviews, and the parties enjoyed a good working relationship for the next several years.

## I. Changes at Apache that led to Davis's complaint of discrimination

Davis contends that this working relationship changed and Apache began discriminating against her in July 2010. At that time, Ricotta promoted Eldridge to Senior Paralegal (the same title as Davis) and gave Fielder, who was already a Senior Paralegal, the additional title of E-Discovery Coordinator. Fielder had been handling the e-discovery duties and Ricotta wanted to give her the title to reflect the additional work that she had been doing, while also giving her a pay increase of $5,100 to account for the additional work. The $5,100 pay increase was determined by Human Resources based on a market comparison of what others in the industry with similar responsibilities earned. After the promotion, Eldridge continued to earn less money than Davis, but Fielder's pay increase based on the e-discovery responsibilities placed her base salary $4,400 per year higher than Davis's base salary.

Davis did not receive a promotion or additional responsibilities. Ricotta stated that Davis, as a Senior Paralegal, already held the highest position available for a paralegal at Apache. Apache considered Fielder's position that encompassed Senior Paralegal and E-Discovery Coordinator to be a hybrid position not applicable to Davis.[3]

---

[3] Davis did not have the same e-discovery experience and was not critical of Fielder's appointment to the role.

In October 2010, Ricotta announced at a litigation department meeting these promotion and title changes for Eldridge and Fielder. Ricotta did not mention Davis at the meeting. Davis stated she was embarrassed and surprised at the announcement because Davis was Ricotta's right-hand paralegal and had twice as many years of paralegal experience as Eldridge and Fielder. In early November 2010, Davis attempted to raise the issue of a promotion with Ricotta. When Davis referenced the promotions for Eldridge and Fielder, Ricotta quickly responded that Fielder did not get a promotion, merely a title change, and seemed to be angry with her for asking. A short time later Davis again tried to raise the issue with Ricotta by asking what promotional opportunities were available for her at Apache. Davis stated that Ricotta responded in a very mocking tone that the only way she would get a promotion was to become a lawyer. Davis then brought up the special research projects and help with reconciling outside legal fees that she had been performing for Ricotta. According to Davis, Ricotta responded that he could get an accountant to do that and he could cut her salary. Ricotta denied threatening Davis regarding her salary.

Davis also spoke with Apache's employment lawyer, David Bernal. She believed she had been passed over in receiving a promotion because of her age and told Bernal that she did not understand why she had been passed over when she was older than the other paralegals and had twice as much experience.[4] Davis acknowledged that there was no position to which Apache could promote her but felt Apache should give her an additional title, as it had for Fielder. Around the same time she spoke with Bernal, Davis also sent an email to Ricotta asking that Apache provide in-house continuing education programs for paralegals and

_____

[4] Davis also felt it unfair that she did not receive a promotion or new title when Eldridge and Fielder did because Eldridge did not have a college degree and Fielder did not have a legal assistant certificate, both of which Davis held.

4

consider additional titles for the most experienced paralegals "as an affirmation that Apache is continually investing in and advancing its valuable and veteran paralegals." At trial, Davis stated she was thinking of three other "older" paralegals with experience similar to hers that she felt should have additional titles: Mary Heinitz, Regina Broughton-Smith, and Susie Zaccaria. Davis specifically requested that Apache consider the title "Senior Paralegal and Legal Research Specialist" for herself. Apache then gave her that title, but it did not come with an increase in salary.

Davis testified that after the promotions for Eldridge and Fielder and discussions with Ricotta regarding promotion opportunities for herself, her working relationship with Ricotta continued to deteriorate. Things felt tense and she was "walking on eggshells" around him, in contrast to their prior "great working relationship." By October 2011, Davis chose to apply for a paralegal opening in the Apache Corporate Secretary's office even though the position paid less than Davis's current position. A younger employee, Melissa Garcia, was filling the position on an interim basis and had more corporate experience than Davis. The Corporate Secretary (a woman the same age as Davis) chose to keep Garcia in the position and did not hire Davis.

Davis testified about two other incidents regarding Ricotta that occurred over the next several months. First, Ricotta replaced a retiring legal assistant with an accountant, who was younger than Davis, to handle the legal fee reconciliation that both Davis and Ricotta had performed. Second, Ricotta asked Davis to stop taking service of process papers out of another employee's tray.[5] When she asked Ricotta why, Ricotta told her it was confusing. Davis viewed this request as

---

[5] The other employee was Ricotta's legal assistant Terri Caldwell, an African-American female in her fifties.

Ricotta taking responsibilities away from her.

On November 12, 2012, Ricotta sent an email to all personnel in the litigation department regarding their projected schedules for 2013. Apache had a policy in effect regarding office hours and scheduling, which provided that Apache's official operating hours were 7:30 a.m. to 5:30 p.m. Monday through Thursday and 7:30 a.m. to 11:30 a.m. on Fridays. Ricotta, who traveled frequently, had allowed employees to monitor their own schedules and permitted flexibility in start and end times. Davis utilized the flexible schedule often, generally working Monday, Wednesday, and Friday beginning at 9:00 or 10:00 a.m. and staying late, often until 9:30 p.m., and Tuesday and Thursday from 9:00 a.m. to 12:30 p.m. and 2:30 p.m. to 8:00 p.m. This schedule allowed Davis to take extended breaks to transport her college-age daughter to and from her college campus.[6] By mid-November 2012, however, Ricotta had attended a management conference where he was reminded of the office-hours policy, and he wanted to make sure his staff had committed to a schedule that complied with the policy.

In Ricotta's November 12, 2012 email, he reminded the employees of the normal Apache office hours and asked each person to submit a proposed schedule for the coming year. He stated in the email that regular business hours were preferred but he would consider requests to adjust the schedule within reason, giving as examples 6:30 a.m. to 4:30 p.m. or 8:00 a.m. to 6:00 p.m. Ricotta also stated that overtime hours would have to be approved in advance.[7] Staff members other than Davis responded to Ricotta's email with a proposed schedule within

---

[6] Davis's daughter attended the University of Houston at this point and lived with Davis. Davis's daughter had a restricted driver's license and no vehicle so Davis, with Ricotta's approval, had used an extended lunch break to pick up her daughter from school, take her home, and then return to Apache.

[7] Davis consistently worked hundreds of overtime hours per year throughout her time at Apache.

Apache's general business hours, or with a start time no later than 8:30 a.m., thus satisfying in Ricotta's mind the corporate policy outlined in the email.[8] Davis submitted a request based on her current schedule that allowed her to transport her daughter to and from college classes, asking to continue arriving between 9:00 a.m. and 10:00 a.m. and staying late.

Ricotta responded by asking Davis to submit a request that kept as many of her 40 work hours per week within "normal Apache business hours." Davis then asked to start each day between 8:30 and 9:00 a.m., while still allowing flexibility for transporting her daughter to classes on Tuesdays and Thursdays. Apache HR manager Mark Forbes, whom Ricotta had brought in to help in responding to Davis's request, instructed Ricotta that a start time after 8:30 would not be permitted under the policy and that Davis could not leave during the day to transport her daughter. Ricotta then told Davis that a 9:00 a.m. start time would not be within company policy, but that he could approve a schedule for Davis of 8:30 a.m. to 6:30 p.m. with one hour for lunch. Davis sent an email to Ricotta stating that the group's success and her own excellent work product was the result of the previously supported flexible schedules. Davis resubmitted her request to start between 8:30 a.m. and 9:00 a.m. and stated she was "hopeful that you will weigh the benefits of allowing me to continue my career at Apache utilizing my current flexible working arrangement." Ricotta viewed Davis's request for the same proposed schedule he had previously rejected to be insubordination. He also felt that Davis's requests for late arrivals, long breaks during the day, and unusually late departure times were not a reasonable accommodation from the

---

[8] The younger paralegals Fielder and Eldridge both sent compliant schedules in response to Ricotta's email, though in practice they repeatedly arrived late to work. Ricotta conceded that Eldridge did not keep the schedule she proposed and that she "lied on her timesheets." When Ricotta later found out about Eldridge arriving late he disciplined her for the late arrivals.

company's general office hours.

Davis also responded to Ricotta's November 12, 2012 email with questions regarding the requirement of overtime pre-approval. Because Eldridge and Fielder took back-to-back maternity leaves in 2012, Davis had incurred a substantial amount of overtime. Ricotta stated that Davis's overtime within that same time period made sense to him because of the maternity leaves. Davis queried whether the new policy on overtime hours related to cost-cutting issues and stated that she would be happy to stop working overtime hours immediately, although she hoped she had earned his trust "to be discerning so that I would not have to ask every time" when trying to meet a deadline. Ricotta confirmed that the change in position on overtime related to Apache's focus on cost control and on Ricotta's efforts to allocate work effectively so that no one had too much work. The second day after this email, Davis, who had not yet changed her schedule, accidentally worked two hours of overtime without advance approval. She informed Ricotta, but he did not reprimand her or tell her she had violated a directive.

On Thursday, November 29, 2012, Davis requested vacation time for the afternoon and following day. That morning, Ricotta asked Davis to perform research. Davis could not complete the assignment before she was scheduled to leave for the afternoon and sent Ricotta an email letting him know. In the email, Davis offered to finish the project in the evening or over the weekend, which would require overtime. Ricotta responded that Davis should give him what she had so far, pick up the project the following week, and that overtime for his research was unnecessary. Davis received Ricotta's email but felt it would be a waste of attorney time to give him the research in its current state. She thus worked through the night, a total of approximately twelve hours of overtime, and sent him an email with the information on Friday morning. Ricotta replied that

8

Davis should not have worked overtime without his approval, that this was the second time she worked overtime without prior approval, and that he "expect[ed] her to follow his instruction regarding overtime without exception." Davis found Ricotta's response extremely upsetting, stating it caused her to go into convulsive breathing.

Ricotta testified that this overtime incident, coupled with Davis's failure to give him a proposed schedule that was within company policy, led him to seriously contemplate terminating Davis's employment. Asked to rate where he was in the decision-making process on a scale of one to ten in favor of termination, Ricotta stated he was at an eight. Davis testified that in the two years since November 2010 when she attempted to speak with Ricotta about promotional opportunities, Ricotta continued to give her "little jabs" and she could not live with it anymore.

## II.    Davis's complaint of discrimination and Apache's investigation

Davis spent the weekend drafting an email to Ricotta, Bernal, and Forbes. The email, sent on December 3, 2012, states in pertinent part as follows:

> It is with deep regret that after working for you so loyally for over five years at Apache Corporation that I must formally claim that you have created a hostile work environment for me in the Legal Department . . . . Therefore, I am also hereby reporting this to the Company via our HR Lawyer, David Bernal, and the Director of HR-North America, Mark Forbes. In the near future, I will describe certain particular abusive incidents and provide evidence of emails where you have belittled and bullied me, especially during the past two weeks, and almost on a daily basis.

> I know that you are aware that your beat downs, intimidation, refusal to discuss these issues with me, and refusal to discuss issues relative to career advancement have caused me great emotional distress because many of our discussions have ended with me in tears, yet you appeared to be indifferent and never expressed remorse. In fact, as I told you some months ago, your devastating words to me caused

nearly a year of depression and prompted me to seek employment in the office of the Company's Corporate Secretary (and elsewhere). . . . If this doesn't evoke any empathy from you, perhaps you should imagine your reaction if your wife or daughter was subjected to similar offensive behavior.

I believe that in the past few weeks, you have deliberately intensified your derisive words toward me, have begun setting me up for failure, and have taken a radical attitude against the long-established flextime of your team . . . . It seems only a matter of time before you take the "kill shot." . . .

. . . I have concluded that you are trying to either drive me out of Apache or are preparing to dismiss me after setting me up to fail. And it has not escaped me that you have already taken a few steps to overcome the void that will exist on our litigation team after you accomplish my termination and complete your plan to circumvent legal challenges to the "age discrimination" and "woman discrimination" components, which violate both Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967. . . . It is the epitome of undeserved hostility and betrayal that prompts my formal claim.

Please note that although I only briefly touched upon the "woman discrimination" aspect of my claim, I have observed and experienced the Company's pervasive negative attitude toward advancing or recognizing the contributions or accomplishments of its female employees. Enough said on that for now; I will elaborate on this issue when I provide the details to the incidents which I reference herein.

. . . I advise that this offensive conduct is unwelcome and it will no longer be tolerated by me. Clearly, although you are a brilliant litigator who has successfully pounded numerous adversaries into the dust, you must stop the intimidation and sabotage of your loyal paralegal. However, if you choose to use your power, position, and legal expertise to make a bigger issue out of this claim, with God's grace, I am prepared to take this claim to another level. Please note that I have done my homework and am well aware that the Company is automatically liable for harassment by a supervisor that results in a negative employment action such as termination, failure to promote, and loss of wages . . . . And it goes almost without saying that you are

10

certainly aware that the law has made it illegal to fire, demote, harass, or otherwise retaliate against an employee because he/she has complained about discriminatory practices.

After receiving the email, Bernal responded to Davis and informed her that the company takes all allegations and complaints of harassment seriously and that it would open an investigation. Davis testified that after she filed her complaint on December 3, 2012, Ricotta shunned her, indicated he was angry with her, and stopped giving her any substantive work.

Apache began its investigation of Davis's claims, with Bernal interviewing Davis and other members of the legal department over the next several weeks. Bernal conceded that Ricotta was his superior and that it could create the appearance of a conflict of interest for the investigator to be investigating a subordinate's claim against his boss, but he felt there was no actual bias. About three weeks after she sent her December 3, 2012 email, Davis gave Bernal a document she had prepared entitled Hostile Workforce Timeline. The timeline began November 12, 2012, with Ricotta's email requesting schedules for 2013, and ended on December 19, 2012, with an informal meeting between Bernal and Davis. It covered the emails between Davis and Ricotta regarding Davis's proposed and rejected schedule for 2013 as well as the November 29, 2012 overtime incident. Davis conceded that the timeline did not have any notes contending she was the victim of age discrimination. On January 9, 2013, Bernal emailed Davis notice that he had found no evidence of discrimination and that he was closing the investigation. Davis thanked Bernal for doing the investigation but stated that she did not trust Ricotta and wanted to work only with Bernal.

Bernal told Ricotta that he could continue his deliberations regarding Davis's employment and do what he thought was "in the best interest of the Legal Group to ensure a cohesive unit going forward." Bernal stated he instructed

11

Ricotta he could not in any way retaliate against Davis for filing the complaint. Bernal also told Ricotta about Davis's comment that she could no longer trust Ricotta and wanted to work only with Bernal. When Ricotta asked for Bernal's opinion regarding what to do with Davis, Bernal told him he should terminate Davis's employment. Ricotta then interviewed the employees in the legal department to obtain information about Davis's efforts to "stoke a rebellion" over the hours policy. Ricotta learned that one of the attorneys preferred not to work with Davis and that Davis had made some unusual religiously-charged comments. Bernal told Ricotta that he believed Davis was unstable and that he did not like working with her.

## III. Davis's termination, EEOC charge, and lawsuit

Ricotta ultimately decided to terminate Davis's employment and informed her of this fact on January 25, 2013. The parties disagree on the reasons given for Davis's termination. Davis contends Ricotta told her she was being fired for the reasons of arriving late to work, not doing her work, and working overtime without approval, which Davis regarded as false reasons. Ricotta contends he discharged Davis because she failed to turn in a schedule, worked overtime at least twice without approval, made inappropriate comments in the workplace, and told Bernal she no longer wished to work with Ricotta.

Davis timely filed a charge of discrimination with the EEOC. In the charge, Davis checked the boxes for retaliation and age but did not check the box for sex. She complained of age discrimination and retaliation for filing a good-faith complaint of age discrimination, but she did not mention gender discrimination or retaliation for filing a complaint of gender discrimination. After the EEOC issued a right-to-sue letter, Davis filed this lawsuit asserting claims for age discrimination and retaliation. She did not pursue a claim for gender discrimination.

12

The trial court submitted several questions to the jury. In Jury Question No. 1, the jury was asked whether age was a motivating factor in Apache's decision to discharge Davis, to which the jury responded "no." In Jury Question No. 3, the jury was asked whether Davis filed "a complaint of age or gender discrimination" with Apache on December 3, 2012. The jury was instructed that Davis had to prove both that: (1) she filed a complaint that put Apache on notice of acts of age or gender discrimination; and (2) as of December 3, 2012, Davis had a good faith, objectively reasonable belief that age or gender discrimination occurred based on circumstances that she observed and reasonably believed. The jury answered "yes" to Jury Question No. 3. In Jury Question No. 4, the jury was asked whether Apache discharged Davis because she filed a complaint of age or gender discrimination on December 3, 2012, to which the jury answered "yes." In Jury Question No. 5, the jury was asked whether Davis engaged in misconduct for which Apache would have legitimately discharged her solely on that basis, to which the jury answered "yes."

The jury awarded Davis no damages for back pay, no future compensatory damages, and $150,000 for past compensatory damages including emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other noneconomic losses. The parties tried the issue of attorneys' fees to the bench. The trial court signed a judgment awarding Davis $150,000 in damages on her retaliation claim, $767,242 in attorneys' fees through trial, $100,000 in conditional appellate fees, and prejudgment and post-judgment interest. This appeal followed.

## ANALYSIS

Apache challenges the trial court's judgment in four issues, arguing the judgment should be reversed because: (1) there is no evidence Davis engaged in a protected activity that could support a retaliation claim; (2) there is no evidence

retaliation was the but-for cause of Davis's termination; (3) Davis did not exhaust her claim of retaliation for making a complaint of gender discrimination and no evidence supports the jury's finding she made a protected complaint of gender discrimination; thus, Jury Question Nos. 3 and 4 commingled a valid theory of liability with an invalid theory of liability; and (4) the attorneys' fees awarded were neither reasonable nor necessary and based on inadmissible and insufficient evidence. We first address Apache's issue regarding exhaustion of her claim of retaliation for making a complaint of gender discrimination because it pertains to the court's jurisdiction. *See In re City of Dallas*, 501 S.W.3d 71, 73 (Tex. 2016) (orig. proceeding) (per curiam). We then turn to Apache's remaining issues.

## I. Davis exhausted her remedy with regard to her claim of retaliation for filing a complaint of gender discrimination.

The Labor Code maintains a comprehensive system of administrative review for claims of unlawful employment practices. *See Czerwinski v. Univ. of Tex. Health Sci. Ctr. at Houston Sch. of Nursing*, 116 S.W.3d 119, 122 (Tex. App.— Houston [14th Dist.] 2002, pet. denied).[9] A person claiming to be aggrieved by an unlawful employment practice in violation of Chapter 21 must exhaust her administrative remedies before bringing a lawsuit. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010); *Czerwinski*, 116 S.W.3d at 121–22. The exhaustion requirement is a "mandatory prerequisite" to suit in Texas. *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 488 (Tex. 1991), *overruled on other grounds by In re United Servs. Auto Ass'n*, 307 S.W.3d 299, 310 (Tex. 2010); *Sw.*

---

[9] Though Chapter 21 of the Labor Code is often referred to as the Texas Commission on Human Rights Act or TCHRA, *see, e.g.*, *Czerwinski*, 116 S.W.3d at 121, subsequent legislation abolished the Texas Commission on Human Rights and transferred those duties to the Texas Workforce Commission Civil Rights Division. *See* Act of June 18, 2003, 78th Leg., R.S., ch. 302, § 1, 2003 Tex. Gen. Laws 1279 (codified at Tex. Lab. Code § 21.0015). We thus refer to the Chapter 21 provisions at issue simply as the Labor Code.

*Convenience Stores, LLC v. Mora*, 560 S.W.3d 362, 400 (Tex. App.—El Paso 2018, no pet.).

To exhaust her remedies, a plaintiff is required to file an administrative charge with the EEOC or the Texas Workforce Commission. *Williams*, 313 S.W.3d at 804–05; *Mora*, 560 S.W.3d at 400. The exhaustion requirement affords the administrative agency the opportunity to investigate the allegation, informally eliminate any discrimination, and minimize costly litigation. *See* Tex. Lab. Code §§ 21.203, 21.204(a), 21.207(a); *Czerwinski*, 116 S.W.3d at 121. "In short, unless and until an employee timely submits her complaint against her employer to the EEOC or TWC in the form of a charge of discrimination, Texas courts are barred from adjudicating that complaint." *Mora*, 560 S.W.3d at 400; *see Tex. Dep't of Transp. v. Esters*, 343 S.W.3d 226, 231 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding failure to exhaust deprives the trial court of subject-matter jurisdiction over the unexhausted claims).

We construe the initial charge liberally and "look slightly beyond its four corners, to its substance rather than its label" in determining whether a claim was included. *City of Sugar Land v. Kaplan*, 449 S.W.3d 577, 581–82 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006)). Nevertheless, we do not construe the charge to include facts that were initially omitted. *Id.* at 582. "A lawsuit under the Act will be limited in scope to only those claims that were included in a timely administrative charge and to factually related claims that could reasonably be expected to grow out of the agency's investigation of the claims stated in the charge." *Id.* In assessing the claims covered by a charge, the most important element is the factual statement contained therein, rather than the boxes that are checked on the form. *Lopez v. Tex. State Univ.*, 368 S.W.3d 695, 702 (Tex. App.—Austin 2012, pet. denied)

(citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970)).

In her EEOC charge, Davis stated that she had been abruptly terminated from her employment with Apache by Ricotta for no plausible reason. She related facts regarding the November 12, 2012 scheduling email, her requested accommodation on the schedule, and allegations that Eldridge and Fielder, who were younger than her, were treated better. After stating a claim for age discrimination, Davis asserted her retaliation claim, stating: "When I could no longer tolerate the discrimination and harassment, I reported my good faith belief of age discrimination on December 3, 2012 (*See attached* as Exhibit 1)." She then stated that, after she reported her belief, Ricotta treated her differently and gave her no substantive work, that she suffered damages, and that a causal link existed between her damages and her good faith report of discrimination. Davis checked the boxes for retaliation and age discrimination but did not check the box for sex discrimination. There is no mention in Davis's charge that she had made a complaint of gender discrimination, no mention of any discriminatory treatment toward women, and no mention that Apache retaliated against her for making a complaint of gender discrimination.

Apache argues that Davis made no factual allegation in her EEOC charge that could reasonably be expected to grow into a claim of retaliation based on a complaint of gender discrimination. Davis points to the fact that her EEOC charge cites her December 3, 2012 email, and she urges us to look beyond the four corners of the charge to the email, as well as to Apache's response to the EEOC as evidence that she exhausted her retaliation claim for making a complaint of gender discrimination. Davis's EEOC charge did not attach the email, and our record does not include Apache's response to the EEOC.

The record does, however, include Defense Exhibit 183, which appears to be

16

an electronic response from Davis to the Texas Workforce Commission. In that response, Davis responds to a question asking whether something specific happened that caused her to be fired by stating that she emailed Ricotta on December 3, 2012, and "claimed age and gender discrimination, and stated that such conduct would no longer be tolerated by me." And, at the pretrial hearing on the motion to dismiss, counsel for Apache stated that the December 3, 2012 email was attached to Apache's response to the EEOC. In *Patton v. Jacobs Engineering*, the Fifth Circuit permitted a plaintiff to show exhaustion of remedies based on an intake questionnaire that was filed with his formal charge. 874 F.3d 437, 443 (5th Cir. 2017). In addition, the defendant's position statement included a response to the challenged claim. *Id.* at 444. The court held that the plaintiff thus triggered "the investigatory and conciliatory procedures of the EEOC" regarding the challenged claim. *Id.* We conclude that the electronic response to the Texas Workforce Commission and counsel's statement[10] that the email was attached to Apache's response is sufficient to show Davis triggered the investigatory and conciliatory procedures necessary to exhaust her claim of retaliation for making a claim of gender discrimination.

We further conclude that the retaliation claim for making a complaint of gender discrimination is factually related to the retaliation for making a complaint of age discrimination such that the claim could be reasonably expected to grow out of the investigation. *See Pacheco*, 448 F.3d at 789; *Alief Indep. Sch. Dist. v.*

---

[10] We are cognizant of the rule that subject-matter jurisdiction may not be conferred through a judicial admission where it would not otherwise exist. *See In re Crawford & Co.*, 458 S.W.3d 920, 928 n.7 (Tex. 2015) (per curiam) (orig. proceeding) (noting judicial admission cannot create subject-matter jurisdiction); *see also Fed. Underwriters Exch. v. Pugh*, 174 S.W.2d 598, 600 (Tex. 1943) ("Jurisdiction of the subject matter exists by operation of law only, and cannot be conferred upon any court by consent or waiver."). We do not interpret counsel's statement that the email was attached to its response to the EEOC charge as a judicial admission creating subject-matter jurisdiction but rather as evidence of an undisputed fact showing jurisdiction exists.

*Brantley*, 558 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). The two retaliation claims are based on the same document—Davis's December 3, 2012 email—and the same action taken by Apache. Thus, it is reasonable to expect that the investigation would include retaliation for making the complaint, whether based on age or gender discrimination. *See Brantley*, 558 S.W.3d at 756–57 (concluding plaintiff exhausted remedies because charge included allegations that described generally the complained-of action or practices).

We overrule the portion of Apache's third issue arguing Davis failed to exhaust her administrative remedies.

## II. There is sufficient evidence to support the jury's finding that Davis engaged in protected activity.

### A. Standards of review and applicable law

Apache's first issue challenges the legal and factual sufficiency of the evidence that Davis engaged in a protected activity to support her retaliation claim. In reviewing the legal sufficiency of the evidence we view the evidence in the light most favorable to the jury's finding, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005); *Houston Methodist San Jacinto Hosp. v. Ford*, 483 S.W.3d 588, 591 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Wilson*, 168 S.W.3d at 819. In reviewing the factual sufficiency of the evidence to support a jury's finding, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Nip v. Checkpoint Sys.,*

18

*Inc.*, 154 S.W.3d 767, 769 (Tex. App.—Houston [14th Dist.] 2004, no pet.). In reviewing the factual sufficiency of the evidence, we examine the entire record, considering the evidence both in favor of and contrary to the challenged finding. *See Ellis*, 971 S.W.2d at 406–07; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Because the jury is the sole judge of the credibility of the witnesses and the weight to afford their testimony, we may not substitute our judgment for that of the trier-of-fact, even if the evidence would support a different result. *Id.* at 615–16. If we conclude the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the challenged finding; we need not do so when we conclude the evidence is factually sufficient. *See Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

To prove a violation of the Labor Code based on unlawful retaliation, Davis must first establish that she engaged in protected activity. *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015) (elements of retaliation claim are: (1) plaintiff engaged in an activity protected by the Labor Code (2) an adverse employment action occurred; and (3) there exists a causal link between the protected activity and the adverse action). Protected activity consists of, among other things, "filing an internal complaint, opposing a discriminatory practice, or making a charge of discrimination with the EEOC." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 786 (Tex. 2018). The legislature intended for state law to correlate with federal law; we may, therefore, look to analogous federal cases when applying the Labor Code. *See* Tex. Lab. Code § 21.001; *Wal-Mart*

19

*Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003). While a burden-shifting analysis applies in discrimination cases that have not been fully tried on the merits, where, as in this case, a trial on the merits has occurred, we assess whether the evidence is legally sufficient to support the jury's ultimate finding. *Canchola*, 121 S.W.3d at 739.

Jury Question No. 3 asked whether Davis filed a complaint of age or gender discrimination with Apache on December 3, 2012, and the jury answered "yes." Jury Question No. 4 asked whether Apache discharged Davis because she filed a complaint of age or gender discrimination on December 3, 2012. Davis's retaliation claim is thus premised upon the complaint made in her December 3, 2012 email.[11] Apache argues there is no evidence that Davis engaged in protected activity because she did not file a complaint of age or gender discrimination on December 3, 2012, and there is no evidence Davis held an objectively reasonable good-faith belief that Apache engaged in actionable discrimination.

## B. Evidence Davis made a complaint of age and gender discrimination.

To invoke the anti-retaliation protection of the Labor Code, an employee must oppose conduct the employee reasonably believes is prohibited by the Code. *See Ford*, 483 S.W.3d at 591. Magic words are not required, but simply complaining of "harassment," "hostile environment," "discrimination," or "bullying" is not sufficient. *Alamo Heights*, 544 S.W.3d at 786-87. There must be some indication that the protected class at issue motivated the conduct opposed. *See id.*; *see also Warrick v. Motiva Enters., L.L.C.*, No. 14-13-00938-CV, 2014 WL 7405645, at *8 (Tex. App.—Houston [14th Dist.] Dec. 30, 2014, no pet.)

---

[11] The only other activity occurring on December 3, 2012, was an email exchange between Davis and Bernal, in which Davis asked whether Bernal had kept his notes from an incident between Davis and Ricotta "some years ago." The emails do not identify the subject of the incident.

(mem. op.) (email not protected activity because it did not allege treatment was based on protected characteristic such as race or perceptions of disability); *Lee v. Harris Cty. Hosp. Dist.*, No. 01-12-00311-CV, 2013 WL 5637049, at *6 (Tex. App.—Houston [1st Dist.] Oct. 15, 2013, pet. denied) (mem. op.) (general complaints not protected where they do not provide connection between opposed behavior and characteristic protected by Labor Code). Details or incidents not included in the complaint cannot be considered in determining whether the employee alerted the employer of a reasonable belief that age discrimination had occurred. *See Alamo Heights*, 544 S.W.3d at 788.

In Jury Question No. 3, the jury was instructed that, to find Davis made a complaint of age or gender discrimination, Davis had to prove both: (1) she filed a complaint that put Apache on notice of acts of age or gender discrimination; and (2) as of December 3, 2012, Davis had a good faith, objectively reasonable belief that age or gender discrimination occurred based on circumstances she observed and reasonably believed. Davis did not object to the instruction to Jury Question No. 3. In analyzing Apache's issue, we thus measure the evidence to support the elements in the charge as given. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex. 2009).

Davis's email complaint is based largely on her assertions that Ricotta engaged in conduct creating a hostile work environment. She complains at length regarding Ricotta's bullying, belittling, and abusive behavior, including claims that he has engaged in "beat downs" and intimidation and directed derisive words toward her. Mere complaints of bullying, intimidation, or "beat downs" is not protected activity as a matter of law; instead, there must be some indication of a belief stated in the complaint that a protected class, such as age or gender, motivated the conduct. In *Alamo Heights*, the Supreme Court of Texas explained:

21

> Though the letter characterized Monterrubio's behavior as "inappropriate," "offensive," "bullying," "harassment," "embarrassing," "rude" and "intimidating," a jury could not reasonably conclude [plaintiff] alerted [defendant] that she thought Monterrubio was acting out of sexual desire towards her or that her conduct otherwise constituted sex-based discrimination.

544 S.W.3d at 787. Simply put, "protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Exxon Mobile Corp. v. Rincones*, 520 S.W.3d 572, 586 (Tex. 2017) (quoting *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (per curiam)). A vague complaint without reference to an unlawful employment practice does not constitute protected activity. *See Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (collecting cases).

We conclude that Davis's December 3, 2012 email did sufficiently identify acts of age and gender discrimination to constitute a protected activity under the standards for legal and factual sufficiency review. Davis expressly references both "age discrimination" and "woman discrimination" and states that Ricotta has taken steps to "overcome the void that will exist on our litigation team after you accomplish my termination," (*i.e.* after Ricotta replaces her) "in violation of both Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967." While the email does not contain the details of her age claim, it sufficed to alert Apache of her belief that Ricotta had taken steps that violated age discrimination laws. *See Ganheart v. Brown*, 740 F. App'x. 386, 390 (5th Cir. 2018) (per curiam) (complaining of staffing "bias," circulating email criticizing discriminatory hiring practices, and expressing concerns regarding equal and fair treatment were related to race and gender equality in the workplace and thus protected activity); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (on reh'g. en banc) (explaining employee is protected when

22

opposing conduct employee reasonably believes is in violation of Title VII that is complete or in progress); *cf. Warrick*, 2014 WL 7405645, at *8 (concluding email did not constitute protected activity in part because the email did "not allege that either her co-worker's treatment or the alleged bullying against her were based on a protected characteristic such as race or perceptions of disability").

With regard to gender, the email states, "I have observed and experienced the Company's pervasive negative attitude toward advancing or recognizing the contributions or accomplishments of its female employees." Failure to promote based on gender can be an unlawful employment practice. *See Tex. State Office of Admin. Hearings v. Birch*, No. 04-12-00681-CV, 2013 WL 3874473, at *18 (Tex. App.—San Antonio July 24, 2013, pet. denied) (mem. op.) (complaining about failure to promote older females was protected activity though employee had no evidence of causal link). Thus, this sentence was sufficient to put Apache on notice of Davis's belief that Apache had engaged in acts of gender discrimination.

Apache argues the December 3, 2012 email is insufficient under *Alamo Heights* because Davis does not link any of the acts referenced in the email to prohibited conduct, and the mere use of buzzwords is insufficient. *See Alamo Heights*, 544 S.W.3d at 786–87 ("Magic words are not required to invoke the TCHRA's anti-retaliation protection. But complaining only of harassment, hostile environment, discrimination, or bullying is not enough." (footnote and internal quotations omitted)).[12] We find *Alamo Heights* distinguishable on this point

---

[12] *See also McNeel v. Citation Oil & Gas Corp.*, 526 S.W.3d 750, 762 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (employee complained of offensive comments and behavior and argued she complained of discrimination but did not specify discriminatory nature of conduct); *Ford*, 483 S.W.3d at 593 n.3 (noting "the report must contain sufficient description to at least alert an employer of what discriminatory practice the employee reasonably believes occurred. . . . The employee must indicate what alleged discriminatory conduct is at issue.") (internal quotation omitted).

because Davis did not use mere buzzwords or the simple phrase "discrimination." *See id.* at 787 (employee did not indicate she believed conduct was based on sexual desire or otherwise constituted sex-based discrimination). Instead, Davis tied her complaint to a protected class by using the words "age discrimination" and "woman discrimination." This was sufficient to alert Apache that Davis was complaining of acts of age and gender discrimination. *See Gonzalez v. Champion Techs., Inc.*, 384 S.W.3d 462, 473 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (concluding complaints of comments made regarding plaintiff's national origin were "certainly complaints related to discrimination" and thus protected activity).[13]

## C. There is sufficient evidence of a good faith, objectively reasonable belief.

Jury Question No. 3 also required Davis to prove that as of December 3, 2012, she "had a good faith, objectively reasonable belief that age or gender discrimination occurred based on circumstances that she observed and reasonably believed." Opposition to a discriminatory practice does not require Davis to establish the merits of her discrimination claim. *See Nicholas*, 461 S.W.3d at 137 ("Opposition to a discriminatory practice is a protected activity irrespective of the

---

[13] Throughout her brief, Davis references complaints other than the email that she contends were protected activity. For instance, she states she made a 2010 discrimination complaint regarding the promotion and title addition for Eldridge and Fielder, she challenged Ricotta's discriminatory refusal to provide her a scheduling accommodation, and she provided Bernal with more information after her December 3, 2012 email in meetings and through the Hostile Workforce Timeline that she gave him weeks after the investigation began, which she describes as oppositional activity under the anti-retaliation law. These activities do not constitute evidence that she engaged in protected activity for two reasons. First, she did not include these actions in her December 3, 2012 email, and thus they cannot be considered in determining whether Davis alerted Apache that her complaint was based on acts of age or gender discrimination. *See Alamo Heights*, 544 S.W.3d at 788. Second, Jury Question No. 3 expressly limited Davis's claim to a complaint of age discrimination *on* December 3, 2012. We must measure the sufficiency of the evidence under the instructions given in the jury charge. *See Nat'l Dev. & Research Corp.*, 299 S.W.3d at 112. Evidence related to actions taken by Davis before or after that date cannot support the jury's finding of a complaint made on December 3, 2012.

merits of the underlying discrimination claim."). But she was required to offer sufficient evidence that she had a good faith, objectively reasonable belief that the conduct she reported violated the law. *Id.* Apache does not challenge whether Davis subjectively or in good-faith held a belief that age or gender discrimination occurred. Apache challenges whether the evidence supports a finding that Davis's belief was objectively reasonable.

Whether Davis's belief was objectively reasonable is measured against existing substantive law describing the parameters of the unlawful conduct. *Ford*, 483 S.W.3d at 592. In determining whether Davis established an objectively reasonable belief, we consider only evidence of what Davis knew and was aware of at the time she made the complaint. *See Nicholas*, 461 S.W.3d at 137 ("[W]hat counts is only the conduct that the person opposed, which cannot be more than what she was aware of." (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1352 (11th Cir. 1999))); *see also Ford*, 483 S.W.3d at 592–93.

As discussed previously, Davis reported in her email that Ricotta was abusive and bullying toward her, and she mentioned discrimination in violation of the Age Discrimination in Employment Act and Title VII. In her brief, Davis cites the following evidence to support her belief that age discrimination occurred:

- In July 2010, Ricotta promoted the younger Eldridge and Fielder but did not promote Davis despite Davis's superior job performance and evaluations;
- Ricotta provided Fielder with outside training, yet never provided outside training to Davis;
- In October 2011, Apache promoted the younger Garcia to the Senior Paralegal position in the Corporate Secretary's office rather than Davis;
- In April 2012, Ricotta stripped Davis of the legal bill reconciliation duties and gave them to the younger and newly hired Alejandra

25

Bravo;

- In November 2012, Ricotta denied Davis a requested scheduling accommodation but granted one to the younger Eldridge and Fielder;

- Apache failed to promote other older female Legal Department employees; and

- Disparate compensation paid to her and Mary Heinitz.

We agree with Apache that the evidence of other employees' salaries and the purported accommodation of Eldridge and Fielder's scheduling requests cannot support her objectively reasonable belief because Davis conceded at trial that she did not have any knowledge of other employees' salary, and she did not know of the schedules approved for Fielder and Eldridge when she made her complaint. Only those facts of which she was aware may support a reasonable belief that discrimination has occurred.[14] *Nicholas*, 461 S.W.3d at 137. Likewise, Apache's hiring of Garcia rather than Davis for the Corporate Secretary paralegal role cannot support a reasonable belief of age discrimination because the role was a lateral transfer that paid less than Davis's salary and would have been a demotion. *See Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999) (holding as a matter of law that "[r]efusing an employee's request for a purely lateral transfer does not qualify as an ultimate employment decision"). No reasonable

---

[14] In its reply brief, Apache argues that Davis may not rely on any evidence or acts that were not cited in her December 3, 2012 email to show her reasonable belief that discrimination occurred, citing *Nicholas*, 461 S.W.3d at 137. We do not view *Nicholas* as holding that only those facts cited in the email may be used to determine whether the employee formed a reasonable belief. While the *Nicholas* opinion does state "what counts is only the conduct that the person opposed, which cannot be more than what she was aware of," the issue in *Nicholas* was the employee's attempt to rely on facts she was not aware of at the time she filed her complaint—not an attempt to rely on facts not included in the complaint. *Id.* In assessing whether an employee had a reasonable belief that discrimination occurred, courts look at the evidence the employee was aware of, not only the evidence that the employee cited in the complaint. *See Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018) (describing inquiry as "whether the circumstances known to [plaintiff] at the time of her complaint support a reasonable belief that a hostile work environment existed or was in progress").

person could believe that the failure to transfer Davis to a lower paying position in this case was age discrimination.

We do, however, find sufficient evidence to support Davis's belief of age discrimination based on the failure to give promotions or additional titles to her and those whom Davis viewed as the older, or veteran, paralegals. A claim of age discrimination based on failure to promote requires proof that: (1) the plaintiff is a member of the protected class; (2) the plaintiff was qualified for a position or desired employment action; (3) the plaintiff was not promoted or given the desired employment action; and (4) the position or action was given to someone outside the protected class. *See Blow v. City of San Antonio*, 236 F.3d 293, 296 (5th Cir. 2001); *see also Dworschak v. Transocean Offshore Deepwater Drilling, Inc.*, 352 S.W.3d 191, 199 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (listing elements of age discrimination case based on termination).

Davis testified that she believed she and other veteran paralegals were discriminated against based on age when she learned of the title change and promotion for Eldridge and title change for Fielder to E-Discovery Coordinator. Of course, Davis's subjective beliefs alone are not sufficient. *Nicholas*, 461 S.W.3d at 138. There must be evidence that a reasonable person would believe the failure to grant titles or promote older or veteran paralegals amounted to age discrimination under the Labor Code. *See id.* ("Regardless of what Nicholas subjectively believed about Flores's conduct, no reasonable person would believe that a handful of lunch invitations amounted to sexual harassment actionable under the TCHRA."). In this case, Davis also testified that she noticed other older women who had been denied opportunities or had what she thought was a pay cut. She cited Mary Heinitz, Terrie Caldwell, Tammy Fitch, Regina Broughton-Smith, and Susie Zaccarria as examples of older women she was thinking of who had not

been given certain titles. According to Davis, she and the older paralegals had more experience and qualifications than Eldridge and Fielder and should also have been given promotions or title changes.[15] Davis also observed Ricotta remove the legal bill reconciliation responsibilities from her and give them to the younger Alejandra Bravo. While Davis may be incorrect that Apache discriminated based on age in failing to give others title changes or promotions or transferring certain of her duties to a younger person with accounting experience, we cannot say no reasonable person would have believed it was based on age.

With regard to gender discrimination, we likewise find sufficient evidence exists to support the jury's finding that Davis held a reasonable belief gender discrimination had occurred. In support of her belief Davis cites the following:

- Apache promoted and transferred Albert Tijerina out of the Litigation Department to a business unit where there were "promotional opportunities" several years earlier but did not transfer Davis to the Corporate Secretary paralegal role;

- Apache subjected Davis to a hostile work environment based, at least in part, on her gender, by refusing to promote her, threatening to cut her salary, stripping her of substantive job responsibilities, obstructing her effort to laterally transfer, denying her a scheduling accommodation, setting her up to fail, and repeatedly berating and intimidating her;

- Ricotta acted out of "sexist animus" because he knew she was a single mother and "was powerless to defend herself," and several years earlier a paralegal complained to Roxanne Armstrong that Ricotta was demanding and wanted priority for his work;

- The Apache Legal Department culture "harbored a sexist, demeaning view of women" based on "sexist epithets" or comments made at trial;

_____

[15] Davis was given the title change she requested when Ricotta gave her the title Senior Paralegal and Legal Research Specialist, but she did not receive any additional compensation with the title change.

28

- Apache failed to promote and disparately compensated numerous older female Legal Department employees; and

- Apache replaced Armstrong with Ricotta, a male, and hired only male attorneys in the litigation department during Davis's tenure at Apache.

We agree with Apache that the bulk of evidence cited by Davis as support for her good faith belief in gender discrimination does not support her claim. For example, the fact that Ricotta knew Davis was a single mother does not suggest gender animus. Moreover, Davis was not at Apache when Armstrong received the complaint about Ricotta from another paralegal, nor did she testify she knew about the complaint. And Davis did not have knowledge of "sexist epithets" or comments made at trial or knowledge of other employees' salaries when she made her complaint on December 3, 2012. As a result, these facts cannot form the basis of a reasonable belief in gender discrimination. *See Nicholas*, 461 S.W.3d at 137.

Moreover, at trial Davis attributed most of her complaints regarding the refusal to promote her, threatening to cut her salary, stripping her of substantive job responsibilities, obstructing her effort to laterally transfer, denying her a scheduling accommodation, setting her up to fail, and repeatedly berating and intimidating her more to age, rather than gender. She stated she believed she had been passed over in receiving a promotion because of her age and described the "woman discrimination" concern expressed in her email as a concern that "older women" were being discriminated against. She did present evidence that she believed Ricotta's decision to require adherence to the Apache office hours policy would have an adverse effect on the mothers in the office.

We conclude that sufficient evidence of an objectively reasonable belief of gender discrimination exists based on her testimony that she observed other women who had not received titles or promotions, knew Apache had allowed male

29

paralegal Albert Tijerina to transfer from litigation to a business unit where there were promotional opportunities, observed Apache replacing Armstrong with a male (Ricotta), and observed Apache hiring only male litigators for the litigation department. The Texas Labor Code provides that an employer commits an unlawful employment practice if because of sex the employer fails or refuses to hire an individual or discriminates against an individual in connection with compensation or the terms, conditions, or privileges of employment. Tex. Lab. Code § 21.051; *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam). Apache accurately points out that Davis did not present evidence as to whether other women applied for and had better credentials for the positions filled by men or evidence of other men that were given titles or promoted. But we conclude this argument goes to the merits of a gender discrimination claim, rather than whether a reasonable person could believe gender discrimination had occurred. Davis was not required to prove the merits of her claim in order to establish a reasonable belief. *See Nicholas*, 461 S.W.3d at 137.

The evidence is legally and factually sufficient to support the jury's finding that Davis filed a complaint of age or gender discrimination. We overrule Apache's first issue.

## III. There is sufficient evidence of but-for causation.

In its second issue, Apache argues there is legally and factually insufficient evidence that Davis's complaint was the but-for cause of Apache's decision to terminate her employment. To support her claim of unlawful retaliation under the Labor Code, Davis must produce evidence of a causal link between her protected activity and the adverse employment action. *See Alamo Heights*, 544 S.W.3d at 789. Jury Question No. 4 instructed the jury that Davis had to establish that without her filing a complaint of age or gender discrimination, her termination

30

would not have occurred when it did. The question further instructed the jury that there may be more than one cause of an employment decision and that Davis need not establish her complaint was the sole cause of Apache's decision.

To determine whether sufficient evidence of but-for causation exists, courts examine all of the circumstances, including the following factors: temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false. *Alamo Heights*, 544 S.W.3d at 790 (citing *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000)). We thus examine the evidence under each of these factors.

1. *Temporal proximity*

Apache terminated Davis's employment approximately seven weeks after she filed her complaint. Such close temporal proximity supports an inference of retaliation. *See River Oaks L-M Inc. v. Vinton-Duarte*, 469 S.W.3d 213, 228 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Apache argues that the timing in this case is at best neutral because Davis conceded in her December 3, 2012 email she knew Ricotta was planning to fire her and "[c]arrying out a previously planned employment decision is no evidence of causation." *Alamo Heights*, 544 S.W.3d at 790.

Ricotta stated that after Davis repeatedly asked to work a schedule that was outside company policy and worked overtime the second time without approval after he told her not to, he was leaning towards terminating her employment. Davis stated in her December 3, 2012 email that she knew Ricotta was "trying to either drive me out of Apache or are preparing to dismiss me after setting me up to

31

fail" and referenced Ricotta's "plan to terminate me without cause" and "circumvent the law." In *Clark County School District v. Breeden*, the Court explained: "Employers need not suspend previously planned transfers upon discovery that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality." 532 U.S. 268, 272 (2001). While the jury could have believed Ricotta that he was already contemplating firing Davis before she sent her email due to the scheduling and overtime issues, the jury also could have believed that he had not planned to do so and instead terminated her employment because she sent the December 3, 2012 email. The close temporal proximity factor weighs in favor of the jury's finding.

2. *Knowledge of the protected activity*

This factor weighs in favor of the jury's finding. It is undisputed that Davis directed her email complaint to Ricotta and that he knew about her complaint at the time he decided to terminate her employment.

3. *Expression of a negative attitude toward the protected activity*

This factor also weighs in favor of the jury's finding because there was evidence that Ricotta displayed a negative attitude toward Davis following the December 3, 2012 email. Davis testified that, after she sent the email, Ricotta "shunned her," did not give her any more substantive work, and one time slammed a door near her office, which she interpreted as anger directed towards her. While Ricotta denied expressing a negative attitude, stating instead that he had been instructed to minimize his contact with Davis during the investigation, and denied slamming the door, the jury was free to believe Davis's testimony and find that Ricotta expressed a negative attitude toward Davis for filing her complaint. *See City of Keller*, 168 S.W.3d at 819 ("[Jurors] may choose to believe one witness and

disbelieve another."); *Jefferson Cty. v. Davis*, No. 14-13-00663-CV, 2014 WL 4262184, at *7 (Tex. App.—Houston [14th Dist.] Aug. 28, 2014, pet. denied) (mem. op.).

4. *Failure to adhere to relevant established company policies*

This factor weighs against the jury's finding because there was no evidence that Apache violated a company policy. While Davis argues that Apache violated its progressive discipline policy by deciding to terminate Davis rather than counsel or discipline her, there was no written discipline policy in evidence and Apache's director of human resources testified that Apache did not require progressive discipline before terminating an employee's employment. Instead, Apache's policy is to allow the supervisor to decide. In the absence of an internal policy requiring progressive discipline, there is no evidence that Apache violated any established company policies. *See Okpere v. Nat'l Oilwell Varco, L.P.*, 524 S.W.3d 818, 832 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

5. *Discriminatory treatment in comparison to similarly situated employees*

Davis argues that Apache disparately disciplined Davis as compared to Eldridge and Fielder. Specifically, she argues Apache took no disciplinary action against the "far more insubordinate Eldridge and Fielder" who violated the office hours policy by arriving late and lying on their timesheets. Apache argues that Davis failed to produce any evidence that it treated her differently in comparison to similarly situated employees because she did not show Eldridge and Fielder committed the same misconduct as Davis—that is, Eldridge and Fielder did not defy orders to stop working overtime and did not refuse to submit a compliant schedule.

To show discriminatory treatment in comparison to similarly situated

employees, Davis had to show that the "circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Alamo Heights*, 544 S.W.3d at 791. To prove disparate discipline, the employee must usually show "that the misconduct for which [he] was discharged was nearly identical to that engaged in by a [female] employee whom [the company] retained." *Monarrez*, 177 S.W.3d at 917 (alteration in original) (quoting *Smith v. Wal-Mart Stores, Inc*., 891 F.2d 1177, 1180 (5th Cir. 1990)). While we agree that arriving late to work and not noting it on the timesheets is different than Davis's conduct, we conclude the jury could find that falsifying timesheets is more serious than not submitting a compliant schedule or working overtime when told not to, yet Davis was disciplined more harshly. *Cf. Monarrez*, 177 S.W.3d at 917 (employee did not establish disparate discipline where the comparators engaged in *less* serious conduct than the discharged employee). This factor weighs in favor of the jury's finding of but-for causation.

6. *Evidence the employer's stated reason for termination is false*

Apache argues that Davis failed to rebut two reasons for her termination: (1) that she defied orders to stop working overtime; and (2) she refused to submit a compliant schedule. We have held that an employee "must rebut each nondiscriminatory reason articulated by the employer" to show but-for causation. *Kaplan v. City of Sugar Land*, 525 S.W.3d 297, 308 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Moreover, simply disputing or denying that the employee engaged in the proffered reasons for the discharge is insufficient to create a fact issue as to causation. *See id.*; *see also Alamo Heights*, 544 S.W.3d at 792 ("Clark denies nearly all of these performance issues, but such denials are insufficient to create a fact issue as to causation. The issue is whether the employer's perception of the problems—accurate or not—was the real reason for termination.").

34

Davis argues that the reasons given for her discharge were proven untrue because, on the overtime, Ricotta "set her up to fail by over-working her and failing to provide her support" and on the compliant schedule issue, she requested an accommodation which Ricotta denied though he accommodated Eldridge and Fielder. Davis provides no record support for her argument that Ricotta set her up to fail regarding the overtime. Regarding the schedule accommodation, the record does not support Davis's claim. Ricotta allowed accommodations of start-times that were "within reason." Ricotta told Davis he could accommodate a start time for her of 8:30 a.m., but that her requested 9:00 a.m. was too far outside of Apache's normal office hours. The accommodations given to Eldridge and Fielder were both within the 8:30 a.m. start time.

Davis also argues that evidence of pretext is found in the fact that Ricotta proffered different reasons to Davis for her termination than those he testified to at trial. We agree. Davis testified that Ricotta told her during the termination meeting on January 25, 2013, that she was being fired for arriving late, working overtime without approval, and not doing her work. Ricotta testified that he discharged Davis because she failed to turn in a compliant schedule, worked overtime at least twice without approval, made inappropriate comments in the workplace, and told Bernal she no longer wished to work with Ricotta. Ricotta expressly denied telling Davis she was being terminated for arriving late to work[16] or for creating more work for other paralegals. We conclude the conflicting evidence of the reasons given for termination is some evidence of pretext. The jury could have believed Davis and disbelieved Ricotta regarding the reasons he gave Davis at her termination and concluded that Apache's reasons for the

---

[16] Davis's badge swipe records show that from December 2, 2012 to December 31, 2012, Davis arrived most days between 9:00 a.m. and 10:00 a.m. and beginning in January 2013 when the new work hours policy was to take effect, Davis arrived most days before 9:00 a.m.

termination thus changed over time, creating a fact issue on pretext. *See Caldwell v. KHOU-TV*, 850 F.3d 237, 242–43 (5th Cir. 2017).[17]  This factor weighs in favor of the jury's finding.

While not all factors courts use to assess evidence of but-for causation support Davis's claim, the factors of timing, knowledge of the complaint by the decision-maker, evidence of a negative attitude by Ricotta towards Davis after she filed her complaint, and evidence the employer's stated reasons for termination changed over time support the jury's finding.  Considering all the circumstances, we conclude that the evidence is legally and factually sufficient to support the jury's finding.

We overrule Apache's second issue.

## IV.    There is no *Casteel* error.

In its third issue, Apache argues the judgment must be reversed and the case remanded for a new trial on the basis of jury charge error under *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000).  Apache specifically contends that Jury Question Nos. 3 and 4 contained an invalid theory of recovery because they allowed the jury to find that Apache retaliated against Davis for filing a claim of gender discrimination when Davis failed to exhaust her remedy on that claim and failed to present evidence she filed a protected complaint of gender discrimination.  Apache objected to the jury charge on these grounds, thus

---

[17] Davis proffers a number of other factors for the court to consider in assessing evidence of but-for causation, including her claim that there were errors or untruths in Apache's EEOC statement, that Apache conducted a bad-faith investigation, and that Apache terminated Davis for "stoking a rebellion" against Apache's office hours policy.  While some of these reasons may have cast doubt on witness credibility, other reasons are not evidence of pretext for causation in this case. *See, e.g.*, *Canchola*, 121 S.W.3d at 740 (rejecting as evidence of pretext claim that investigation was "inadequate and one-sided").  We do not address these reasons in detail because they either do not support causation or because they would not change our analysis.

36

preserving error.

Given our conclusions above that Davis exhausted her administrative remedy on her claim of retaliation for making a complaint of gender discrimination and presented evidence of a protected complaint of gender discrimination, we conclude Jury Question Nos. 3 and 4 did not contain an invalid theory of recovery.

We overrule Apache's third issue.

## V. There is sufficient evidence to support the attorneys' fees awarded to Davis, except for Herlong's fees.

In its fourth issue, Apache challenges the legal and factual sufficiency of the evidence to support the trial court's award of $767,242 in attorneys' fees to Davis. Apache argues three main bases in support of its challenge: (1) the award of fees is grossly disproportionate to the results obtained; (2) fees for one of the attorneys, Dennis Herlong, are not substantiated by the record because the trial court awarded fees for more hours than Herlong billed and the hours Herlong did bill are not sufficiently detailed; and (3) the fee award was influenced by improper admission of Apache's attorneys' fees. We agree with Apache regarding the award of fees to Herlong.

### A. Standards of review and applicable law

We review a trial court's judgment awarding attorneys' fees for an abuse of discretion. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018). A prevailing party in a retaliation claim under the Labor Code may recover a "reasonable attorney's fee as part of the costs." Tex. Lab. Code § 21.259. Courts utilize the lodestar method when determining a reasonable fee under the statute. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012); *River Oaks L-M Inc.*, 469 S.W.3d at 232.

The lodestar method for proving attorneys' fees requires an assessment of the evidence of hours worked for each attorney multiplied by their respective hourly rates to determine the total fee. *See Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014). A party using the lodestar method must offer evidence of the time expended on particular tasks. *See id.* at 254–55. The evidence must be sufficiently specific to allow the fact finder to determine the amount of time spent on each particular task and to decide whether that length of time was reasonable. *El Apple I*, 370 S.W.3d at 763. "A meaningful review of the hours claimed is particularly important because the usual incentive to charge only reasonable attorney's fees is absent when fees are paid by the opposing party." *Id*. at 762.

## B. The total fees awarded is not grossly disproportionate.

Apache first argues the fee award is grossly disproportionate to the result obtained because the award is five times greater than the actual damages recovered and nineteen times more than the $40,000 in incremental value Davis obtained from the jury as compared to the $110,000 Apache offered to settle before trial. We conclude that the trial court acted within its broad discretion given the nature of this particular litigation.

Although this is a single-plaintiff employment dispute, the evidence presented to the trial court included a significant number of hours expended by Davis's attorneys in litigating the case for over two years. The record reveals that both sides engaged in contentious litigation conduct. During the course of the litigation, Davis filed nine motions to compel, deposed eleven witnesses, defended six depositions, participated in mediation, and prepared numerous pleadings and briefing. The parties tried the case to a jury for over two weeks. We afford considerable deference to the trial court's determination regarding whether counsel's claimed hours are excessive, redundant, or unreasonable in light of the

38

record as the trial court "possesses a superior understanding of the case and the factual matters involved." *Id.* at 763–64. The trial court witnessed the vast bulk of the conduct engaged in by both sides and was in the best position to determine whether the hours claimed were reasonable.

Apache also argues that the fee award in this case is complicated by Davis's failure to segregate her fees between the unsuccessful discrimination claim and the successful retaliation claim. The trial court expressly found in its findings of fact and conclusions of law that the legal work her attorneys performed on her unsuccessful age discrimination claim advanced her successful retaliation claim because the facts related to both claims were inextricably intertwined. We agree with the trial court. "[T]he need to segregate attorney's fees is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and fact." *CA Partners v. Spears*, 274 S.W.3d 51, 81 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). If discrete legal services advance both a recoverable and unrecoverable claim such that they are inextricably intertwined, the fees need not be segregated. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006).

Newar testified that to prove the retaliation claim Davis had to establish a good faith belief that age discrimination had occurred and that the two claims were inextricably intertwined. Counsel for Apache also agreed as a general rule that "in order to further a retaliation claim it is important to at least substantiate that there was a good-faith basis of discrimination." An attorney's testimony that discrete legal services are related to or intertwined with the claim for which fees were permitted can support a trial court's award of fees. *See River Oaks L-M*, 469 S.W.3d at 234; *Sentinel Integrity Solutions, Inc. v. Mistras Group, Inc.*, 414 S.W.3d 911, 930 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Newar also

39

testified that he would discount the fees requested by five percent to account for the unsuccessful claim. The trial court reduced fees for Newar by $100,375 from the amount stated in his invoice, a reduction of just over fifteen percent. *See Tony Gullo Motors*, 212 S.W.3d at 314 (noting as an example that an opinion stating that ninety-five percent of drafting time would have been necessary even without the unsuccessful claim would have been sufficient).

## C.     The evidence of Herlong's fees is legally insufficient.

We agree with Apache that the fees awarded for Herlong's work are not supported by the evidence. The trial court awarded $132,750 for Herlong's fees. This fee represented 265.50 hours of work. Invoices of Herlong's fees, however, document only 163 hours of work. Herlong did testify that he incurred $132,750 in fees but did not bill all of his time. He explained that his role was to be co-counsel to Newar, that he attended some depositions and hearings, and that he engaged in trial preparation. His testimony did not provide any evidence of how much time he spent on each task nor a description for the fact finder to determine that the amount of time spent was reasonable. Herlong discussed the fee factors generally, but "generalities about tasks performed provide insufficient information for the fact finder to meaningfully review whether the tasks and hours were reasonable and necessary under the lodestar method." *Long*, 442 S.W.3d at 255; *Hong v. Havey*, 551 S.W.3d 875, 893 (Tex. App.—Houston [14th Dist.] 2018, no pet.). A trial court's fee award cannot be based on evidence that fails to describe tasks and allocate hours spent on those tasks.[18] *See Hong*, 551 S.W.3d at 893.

Herlong's invoice is also largely unsupportive of the request for his fees.

---

[18] Apache does not challenge the sufficiency of the descriptions of services provided by attorneys Gardner, Newar, or Zimmerman, and we accordingly express no opinion regarding whether those descriptions were sufficient to support the trial court's fee determination.

The majority of the descriptions on Herlong's invoice contain very little detail regarding the work performed, including, for example, statements of "meeting with client and Scott Newar" or "attend Amazon hearing." Herlong did include in his fee statements notations of time for attending trial and attending hearings, events and activities that both the trial court and counsel for Apache would have been able to witness. *See City of Laredo v. Montano*, 414 S.W.3d 731, 737 (Tex. 2013) (per curiam) (noting as support for amount awarded for trial attendance the fact that opponent witnesses, at least in part, the services provided by counsel). Thus, the trial court did have sufficient evidence to determine the reasonableness of a portion of the fees awarded for Herlong's time.

We conclude that there is legally insufficient evidence to support the trial court's total award of $767,242 in fees because it includes $132,750 for Herlong's time and that amount is not supported. Although we ordinarily render judgment when we sustain a no evidence issue, when there is some evidence of damages, though not enough to support the full amount, we may suggest a remittitur. *See Akin, Gump, Strauss, Hauer & Feld*, 299 S.W.3d at 124; *see also Range v. Calvary Christian Fellowship*, 530 S.W.3d 818, 840 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). We do so here. Because the evidence supports fees for 124 hours of Herlong's time documented in his invoice at the rate of $500 per hour, resulting in fees in the amount of $62,124, but not in the amount of $132,750 as awarded by the trial court, we suggest a remittitur of $70,626. If Davis accepts our suggestion of remittitur, we will modify the trial court's judgment accordingly and affirm as modified. Otherwise, we will reverse that portion of the trial court's judgment awarding attorneys' fees to Davis and remand to the trial court for a new trial on attorneys' fees.

### D. Alleged improper admission of Apache's attorneys' fees

Apache argues that the trial court improperly admitted evidence of Apache's attorneys' fees and that it influenced the trial court's fee award. Citing *In re National Lloyds Insurance Co.*, Apache states evidence of an opposing party's fees lack genuine probative value as a comparator for a requesting party's fees and should not be considered by the fact finder. 532 S.W.3d 794, 812 (Tex. 2017) (orig. proceeding); *see also Range*, 530 S.W.3d at 840 (noting "evidence of one side's reasonable and necessary attorneys' fees is not evidence of the opposing side's reasonable attorneys' fees"). Apache accurately sets forth the rule stated in *In re National Lloyds*, but we find no evidence in the record that the trial court in fact relied on Apache's fees in making its award. The findings of fact and conclusions of law make no reference to Apache's fees, nor do we find evidence in the record of the trial court mentioning Apache's fees as a basis for its ruling. As discussed above, the trial court had sufficient evidence to support its award of fees from invoices and testimony provided by Newar and Herlong, with the exception of portions of Herlong's fees. As a result, we conclude that Apache has not established the trial court was improperly influenced by the admission of evidence of Apache's attorneys' fees.

We sustain in part and overrule in part Apache's fourth issue.

### CONCLUSION

Having overruled Apache's four issues on appeal in whole or in part, we affirm in part and reverse in part the trial court's judgment. With regard to the award of attorneys' fees, we suggest a remittitur in the amount of $70,626. If Davis accepts the suggestion of remittitur by filing a remittitur within twenty days from the date of this opinion, we will modify the trial court's judgment accordingly and affirm the judgment as modified. If Davis does not accept our suggestion of

42

remittitur, we will reverse the trial court's judgment in part and remand for a new trial on attorneys' fees.  We affirm the remainder of the trial court's judgment.


/s/     Ken Wise
Justice

Panel consists of Justices Christopher, Wise, and Hassan.